745 S.E.2d 508

Lisbeth L. **CHERRINGTON,**
**Plaintiff Below;**

The **Pinnacle Group, Inc., A West Virginia Corporation; and Anthony Mamone, Jr., An Individual, Defendants and Third–Party Plaintiffs Below, Petitioners**

v.

**ERIE INSURANCE PROPERTY AND CASUALTY COMPANY, Third–Party Defendant Below, Respondent.**

No. 12–0036.

Supreme Court of Appeals of West Virginia.

Submitted March 27, 2013.

Decided June 18, 2013.

---

Marvin W. Masters, Kelly Elswick–Hall, The Masters Law Firm LC, Charleston, WV, Richard E. Ford, Jr., The Ford Law Firm, Lewisburg, WV, Attorneys for the Petitioner, Lisbeth L. Cherrington.

Michelle E. Piziak, Steptoe & Johnson PLLC, Charleston, WV, Attorney for the Respondent, Erie Insurance Property and Casualty Company.

James R. Sheatsley, Gorman, Sheatsley & Company, L.C., Beckley, WV, Attorney for the Petitioners, The Pinnacle Group, Inc., and Anthony Mamone, Jr.

DAVIS, Justice:

The petitioners herein, Lisbeth L. Cherrington (hereinafter "Ms. Cherrington"); [1] The Pinnacle Group, Inc. (hereinafter "Pinnacle"); and Anthony Mamone, Jr. (hereinafter "Mr. Mamone"),[2] appeal from an order entered December 6, 2011, by the Circuit Court of Greenbrier County. By that order, the circuit court awarded summary judgment to the respondent herein, Erie Insurance

---

**1.** Ms. Cherrington was the plaintiff in the underlying proceedings.

**2.** Pinnacle and Mr. Mamone were the defendants in the underlying proceedings. These defendants also became third-party plaintiffs when they filed third-party complaints against (1) GLW Construction, Inc. (hereinafter "GLW Construction") and (2) Navigators Insurance Company (hereinafter "Navigators") and Erie Insurance Property and Casualty Company (hereinafter "Erie").

Property and Casualty Company (hereinafter "Erie"),[3] finding that the three policies of insurance issued by Erie to Pinnacle (commercial general liability policy (hereinafter "CGL")) and Mr. Mamone (homeowners policy and personal catastrophe (hereinafter "umbrella") policy) did not provide coverage for the injuries and property damage allegedly sustained by Ms. Cherrington. Before this Court, the Petitioners[4] contend that the subject policies of insurance provide coverage in this case and that none of the policies' exclusions operate to preclude coverage. Upon a review of the parties' arguments, the appendix record, and the pertinent authorities, we affirm the decision of the Greenbrier County Circuit Court finding that neither Mr. Mamone's homeowners policy nor his umbrella policy provides coverage under the facts of this case. However, we reverse the circuit court's ruling finding no coverage to exist under Pinnacle's CGL policy and remand this case for further proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The case *sub judice* originated in July 2004 when Ms. Cherrington entered into a "cost plus" contract with Pinnacle for the construction of a home in Greenbrier County, West Virginia. In addition to the completion of the home, the contract also included landscaping and interior furnishings. Mr. Mamone, who allegedly was working on his own behalf[5] and also as an agent of Pinnacle, worked with Ms. Cherrington during the contract and construction processes.

During the construction of the home, disputes arose between Ms. Cherrington and Pinnacle when Ms. Cherrington believed that the contract price included all of the landscaping charges but she was asked to provide additional funds therefor. Additionally, Ms. Cherrington felt that she had been overcharged for the interior furnishings provided under the contract.[6] After the home was completed, Ms. Cherrington observed various defects in the house, including an uneven concrete floor on the ground level of the house; water infiltration through the roof and chimney joint; a sagging support beam; and numerous cracks in the drywall walls and partitions throughout the house.[7]

In 2006, Ms. Cherrington filed the instant lawsuit against Pinnacle and Old White Interiors, LLC, and, in 2007, Ms. Cherrington amended the complaint to add Mr. Mamone as a defendant. Both the original and first amended complaints contain substantially the same allegations that "Pinnacle was negligent in the construction of said home in the following matters: (a) Altering the design; (b) Negligently pouring and finishing the concrete floor; (c) Finishing and painting of the house; and (d) Placing and securing the foundation." Ms. Cherrington also averred that Pinnacle had breached its fiduciary duty to her by not securing materials and furnishings for the project within the contemplated contract price. She further claimed that she had sustained damages as a result of Pinnacle's "misrepresentations ... [and] negligent acts ... in that her home's fair market value has been and is substantially diminished; plaintiff paid excess moneys to Pinnacle above the amount actually owed; and plaintiff has been subjected to emotional distress and has otherwise been damaged." Ms. Cherrington also claimed that she had been "wrongfully and falsely overcharged for furnishings" and that "[t]he defendants' conduct

---

3. Erie was a third-party defendant in the underlying proceedings.

4. For ease of reference, Ms. Cherrington, Pinnacle, and Mr. Mamone also will be referred to collectively as "the Petitioners," unless the context requires individual references.

5. It appears from the record that Mr. Mamone worked on his own behalf vis-a-vis that portion of the parties' contract whereby Old White Interi-

ors, LLC, would provide furnishings for the home upon its completion. However, the exact role of Mr. Mamone in this business is not apparent.

6. *See supra* note 5.

7. Pinnacle and Mr. Mamone assert that, "other than some of the trim work and siding work," all of the work about which Ms. Cherrington complains was performed by subcontractors.

was intentional and willful misconduct" that entitles her to punitive damages.

During the period of the home's contract negotiation and construction, both Pinnacle and Mr. Mamone had in effect policies of insurance from Erie. Pinnacle had a policy of commercial general liability ("CGL") insurance, that was effective from January 1, 2004, through January 1, 2005. Mr. Mamone had a policy of homeowners insurance with Erie, effective from January 14, 2004, through January 14, 2005, and a personal catastrophe ("umbrella") policy of insurance that was effective from April 19, 2004, through April 19, 2005. Following the filing of Ms. Cherrington's lawsuit, both Pinnacle and Mr. Mamone requested Erie to provide coverage and a defense in accordance with their respective policies. Erie denied both coverage and a duty to defend under the Pinnacle and Mamone policies.

Thereafter, Pinnacle and Mr. Mamone filed a third-party complaint against Erie seeking a declaration of the coverage provided by their policies of insurance.[8] Erie then filed a motion for summary judgment contending that the subject insurance policies do not provide coverage for the claims asserted by Ms. Cherrington and that Erie is not obligated to provide a defense to either Pinnacle or Mr. Mamone.

By order entered December 6, 2011, the circuit court granted Erie's motion for summary judgment. The circuit court determined that Ms. Cherrington had failed to state a claim for damages that would be covered by any of the policies of insurance issued to Pinnacle or Mr. Mamone. In this regard, the court found that Pinnacle's CGL policy provided coverage for "bodily injury" or "property damage" but that Ms. Cherrington's allegations of emotional distress, without physical manifestation, did not constitute a "bodily injury" under the policy's definition of that term. Likewise, the circuit court concluded that Ms. Cherrington had failed to establish covered "property damage" insofar as the damages she alleged in her complaint were economic losses for diminution in the value of her home or excess charges she was required to pay under the contract. *Citing* Syl. pt. 3, *Aluise v. Nationwide Mut. Fire Ins. Co.,* 218 W.Va. 498, 625 S.E.2d 260 (2005).

The circuit court also determined that Ms. Cherrington had not established that an "occurrence" or "accident" had caused the damages she allegedly had sustained because faulty workmanship, in and of itself, or absent a separate event, is not sufficient to give rise to an "occurrence." *Citing Corder v. William W. Smith Excavating Co.,* 210 W.Va. 110, 556 S.E.2d 77 (2001); *State Bancorp, Inc. v. United States Fid. & Guar. Ins. Co.,* 199 W.Va. 99, 483 S.E.2d 228 (1997). Thus, the court found that even if Ms. Cherrington had sustained covered losses, there had been no "occurrence" to trigger coverage under Pinnacle's CGL insurance policy.

Additionally, the circuit court found that, assuming *arguendo,* Pinnacle's CGL policy provided coverage for Ms. Cherrington's claims, coverage nevertheless would be barred by the operation of the policy's exclusions. Although the parties addressed exclusions L ("Damage to your Work"), M ("Damage to Impaired Property or Property Not Physically Injured"), and N ("Recall of Products, Work or Impaired Property"), the court concluded that exclusion M would operate to preclude coverage because it applies "irrespective of the existence of subcontractors." *Citing North American Precast, Inc. v. General Cas. Co. of Wisconsin,* 413 Fed.Appx. 574 (4th Cir.2011) (per curiam); *Groves v. Doe,* 333 F.Supp.2d 568 (N.D.W.Va.2004).

The circuit court further found that, for the same reasons, coverage was not provided by Mr. Mamone's personal policies of insurance because Ms. Cherrington had not sustained a "bodily injury" or "property damage" and because no "occurrence" had caused her loss. Additionally, the circuit court determined that even if Mr. Mamone's homeowners or umbrella policies provided coverage, such coverage would be barred by the operation of the policies' business pursuits exclusion because "the subject litigation

---

**8.** Pinnacle and Mr. Mamone also filed a third-party complaint against GLW Construction, Inc., the subcontractor they claim performed most of the work on Ms. Cherrington's house that she alleges is defective. GLW Construction is not a party to the instant appeal.

arose out of Mr. Mamone's continuous or regular activity for the purpose of gaining a profit or livelihood." *Citing Huggins v. Tri–County Bonding Co.*, 175 W.Va. 643, 337 S.E.2d 12 (1985); Syl. pt. 1, *Camden Fire Ins. Ass'n v. Johnson*, 170 W.Va. 313, 294 S.E.2d 116 (1982).

Finally, the circuit court ruled that Erie did not have a duty to provide either Pinnacle or Mr. Mamone a defense to Ms. Cherrington's lawsuit. From these adverse rulings, Pinnacle and Mr. Mamone, joined by Ms. Cherrington, appeal to this Court.

## II.

### STANDARD OF REVIEW

■ On appeal to this Court, the Petitioners challenge the circuit court's interpretation of the applicable policies of insurance and the resulting award of summary judgment to Erie based upon this interpretation. When asked to review a circuit court's construction of a policy of insurance, we previously have held that "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syl. pt. 1, *Tennant v. Smallwood*, 211 W.Va. 703, 568 S.E.2d 10 (2002). Moreover, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement [sic], shall be reviewed *de novo* on appeal." Syl. pt. 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999).

■ In rendering its ruling regarding the scope of the policies' coverage in this case, the circuit court awarded summary judgment to Erie. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). As we also observed in Syllabus point 2 of *Riffe*, 205 W.Va. 216, 517 S.E.2d 313, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

Our review of the parties' arguments will be guided by these standards.

## III.

### DISCUSSION

Before this Court, the Petitioners assign as error the circuit court's rulings that (1) there was no property damage caused by an occurrence under Pinnacle's CGL policy; (2) the CGL policy's exclusions for "your work" and "impaired property or property not physically injured" precluded coverage; and (3) Mr. Mamone's homeowners and umbrella insurance policies, which cover acts of the insured as a salesman, did not provide coverage. Furthermore, the Petitioners argue that the circuit court refused to interpret the policies consistently with the reasonable expectations of Pinnacle and Mr. Mamone.[9] We will consider these assigned errors in turn.

*A. Coverage under Pinnacle's Commercial General Liability ("CGL") Policy*

The first policy of insurance at issue in these proceedings is the policy of CGL insurance that Erie issued to Pinnacle. In the proceedings below, the circuit concluded that the CGL policy did not provide coverage for Ms. Cherrington's claims because (1) the alleged injuries and damages were not caused

---

9. Pinnacle and Mr. Mamone did not assign error to the circuit court's conclusion that Erie had no duty to defend them with respect to the claims Ms. Cherrington has asserted against them. While the Petitioners' brief succinctly quotes the case of *Aetna Casualty and Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986), wherein this Court addressed an insurer's duty to defend, an isolated case reference, without supporting argument, is not sufficient to preserve this issue for appellate consideration. *See generally State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing . . . , are not considered on appeal."); *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) ("[C]asual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." (internal quotations and citation omitted)). *Accord Covington v. Smith*, 213 W.Va. 309, 317 n. 8, 582 S.E.2d 756, 764 n. 8 (2003).

by an "occurrence" so as to trigger coverage under the CGL policy, and (2) even if the CGL policy provided coverage for Ms. Cherrington's claims, such coverage is precluded by the operation of three of the CGL policy's exclusions. We will consider each of these issues separately.

■ **1. Coverage under CGL policy.** The Petitioners first assign error to the circuit court's ruling that Pinnacle's CGL policy does not provide coverage for Ms. Cherrington's claims because defective workmanship does not constitute an "occurrence" so as to trigger coverage thereunder. In rendering its ruling, the circuit court relied upon this Court's prior decision holding that CGL insurance does not provide coverage for defective workmanship. *See Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77 (2001). Before this Court, the Petitioners urge that the subject CGL policy should be read to provide coverage for Ms. Cherrington's claims. Erie rejects the Petitioners' contentions and maintains that the circuit court correctly found that Pinnacle's CGL policy does not provide coverage for allegedly defective workmanship.

The CGL policy that Erie issued to Pinnacle defines the scope of the policy's coverage in pertinent part as follows:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" [10] or "property damage" [11] to which this insurance applies.

This insurance applies to "bodily injury" and "property damage" only if:

10. The subject CGL policy defines "bodily injury" as follows:

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

11. "Property damage" is defined in the subject CGL policy, in pertinent part, as follows:

"Property damage" means:
 a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

1) The "bodily injury" [12] or "property damage" [13] is caused by an "occurrence"[.] [14]

(Footnotes added). The policy then defines the term "occurrence," referenced in its insuring clause, as

an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Noticeably absent from the policy's definitional section, however, is the term "accident," which is used in the policy's definition of "occurrence" but which is not defined by the subject policy.

We previously have addressed the same issue that has been presented for the Court's resolution in the case *sub judice:* is defective workmanship a covered "occurrence" under the provisions of a policy of CGL insurance? Our decision in *Erie Insurance Property and Casualty Co. v. Pioneer Home Improvement, Inc.*, 206 W.Va. 506, 526 S.E.2d 28 (1999), began this Court's trilogy of seminal cases on this issue by concluding that a claim for faulty workmanship is not covered by a CGL policy:

A lawsuit commenced by a building owner against a building contractor alleging damages caused by faulty workmanship is not within the coverage provided by the contractor's general liability policy of insurance unless such coverage is specifically included in the insurance policy. A commercial general liability policy insurer has no duty to defend a contractor in a lawsuit nor to indemnify a contractor for sums paid to settle the lawsuit or to satisfy a judgment unless the insurance policy specifically requires the insurer to do so.

 b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

12. *See supra* note 10.

13. *See* note 11, *supra*.

14. The policy further requires that the referenced bodily injury or property damage occur within the policy's "coverage territory" and "during the policy period." The parties do not dispute that these criteria have been satisfied in the case *sub judice*.

Syl. pt. 2, *id.* Thereafter, we again considered this issue in *Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77 (2001), wherein we reiterated and clarified our prior holding as follows:

> Commercial general liability policies are not designed to cover poor workmanship. Poor workmanship, standing alone, does not constitute an "occurrence" under the standard policy definition of this term as an "accident including continuous or repeated exposure to substantially the same general harmful conditions."

Syl. pt. 2, *id.* Finally, in *Webster County Solid Waste Authority v. Brackenrich and Associates, Inc.*, 217 W.Va. 304, 617 S.E.2d 851 (2005), we further expanded our prior holdings that defective workmanship is not a covered occurrence by explaining our view of the scope of a CGL policy's coverage:

> Rather than providing coverage for a product or work performance that fails to meet contractual requirements, the commercial general liability policy is specifically designed to insure against the risk of tort liability for physical injury to persons or property sustained by third parties as a result of the product or work performed or damages sustained by others from the completed product or finished work. Because faulty workmanship claims are essentially contractual in nature, they are outside the risks assumed by a traditional commercial general liability policy.

Syl. pt. 3, *id. See also* Syl. pt. 2, *McGann v. Hobbs Lumber Co.*, 150 W.Va. 364, 145 S.E.2d 476 (1965) ("A liability insurance policy, unlike a builder's risk policy, is designed to indemnify the insured against damage to other persons or property caused by his work or property and is not intended to cover damage to the insured's property or work completed by him.").

Despite this Court's express holdings that a CGL policy does not provide coverage for defective workmanship, we are acutely aware that, after we rendered these rulings, many other courts also considered this issue and rendered their own rulings.[15] Some of those jurisdictions have reached conclusions similar to those expressed in our prior opinions.[16] However, a majority of other states have reached the opposite conclusion, announcing their contrary view either in judicial decisions [17] or through legislative amendments to their states' insurance statutes.[18] While we appreciate this Court's duty to follow our prior precedents, we also are cognizant that *stare decisis* does not require this Court's continued allegiance to cases whose decisions were based upon reasoning which has become outdated or fallen into disfavor. "Although we fully understand that the doctrine of stare decisis is a guide for maintaining stability in the law, we will part ways with precedent that is not legally sound." *State v. Sutherland*, 231 W.Va. 410, 417, 745 S.E.2d 448, 455, 2013 WL 2460632, slip op. at 15 (No. 11–0799 June 5, 2013). Thus, "when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted." *Woodrum v. Johnson*, 210 W.Va. 762, 766 n. 8, 559 S.E.2d 908, 912 n. 8 (2001) (internal quotations and citations omitted). *See also* Syl. pt. 2, in part, *Dailey v. Bechtel Corp.*, 157 W.Va. 1023, 207 S.E.2d 169 (1974) ("An appellate court should not overrule a previous decision ... without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law."). We recognize that a definite trend in the law has emerged since we rendered our determinative decision in *Corder* sufficient to warrant this Court's reconsideration of the issues decided therein and that, if warranted, a departure from this Court's prior opinions would be consistent with this Court's steadfast resolve to follow the law to achieve just,

---

**15.** *See generally* Christopher C. French, *Construction Defects: Are They "Occurrences"?*, 47 Gonz. L.Rev. 1 (2012) (compiling cases considering whether defective workmanship constitutes an "occurrence" under provisions of CGL insurance policy).

**16.** *See infra* note 21.

**17.** *See* note 19, *infra.*

**18.** *See infra* note 20.

fair, and equitable results. *See, e.g., State v. Sutherland*, 231 W.Va. 410, 745 S.E.2d 448, 2013 WL 2460632 (No. 11–0799 June 5, 2013) (overruling Court's prior precedent to adopt view in line with majority of jurisdictions addressing issue); *State of West Virginia ex rel. Discover Fin. Servs., Inc. v. Nibert*, 231 W.Va. 227, 744 S.E.2d 625, 2013 WL 2460623 (Nos. 13–0086 & 13–0102 June 4, 2013) (overruling Court's prior precedent to correct "serious judicial error" therein (internal quotations and citation omitted)).

As we have noted, many cases have emerged since this Court's 2001 definitive holding in *Corder* considering whether defective workmanship is an "occurrence" under a policy of CGL insurance. To summarize these rulings, the courts adopting the majority view have concluded that the subject CGL policy provided coverage for the defective work.[19] Three states have enacted legislation requiring CGL policies to include coverage for defective work and/or injuries and damages attributable thereto.[20] By contrast, since this Court's decision in *Corder*, a mi-

**19.** *See Lennar Corp. v. Auto–Owners Ins. Co.*, 214 Ariz. 255, 262–64, 151 P.3d 538 (Ct.App.2007) (finding that damages resulting from defective workmanship constitute an "occurrence" under CGL policy); *Century Indem. Co. v. Hearrean*, 120 Cal.Rptr.2d 66, 98 Cal.App.4th 734 (2002) (concluding that defective construction triggered coverage as an "occurrence" under CGL policy); *Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 67 A.3d 961, 975 (2013) ("[W]e conclude that defective workmanship can give rise to an "occurrence"[.]"); *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 888 (Fla.2007) ("We hold that faulty workmanship that is neither intended nor expected from the standpoint of the contractor can constitute an 'accident' and, thus, an 'occurrence' under a post–1986 CGL policy."); *American Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., Inc.*, 288 Ga. 749, 752, 707 S.E.2d 369, 372 (2011) ("[A]n occurrence can arise where faulty workmanship causes unforeseen or unexpected damage to other property."); *Sheehan Constr. Co., Inc. v. Continental Cas. Co.*, 935 N.E.2d 160, 171–72 (Ind.2010) ("[F]aulty workmanship may constitute an accident and thus an occurrence [under a CGL policy]."), *modified on other grounds*, 938 N.E.2d 685 (Ind.2010); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 859, 137 P.3d 486, 495 (2006) ("The damage in the present case is an occurrence—an even more expansive coverage term than 'accident'—because faulty materials and workmanship provided by [the] subcontractors caused continuous exposure of the [property owner's] home to moisture. The moisture in turn caused damage that was both unforeseen and unintended."); *Wanzek Constr., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322 (Minn.2004) (determining CGL policy provided coverage for faulty work of subcontractor); *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So.3d 1148, 1162 (Miss. 2010) ("[T]he term 'occurrence' cannot be construed ... to preclude coverage for unexpected or unintended 'property damage' resulting from negligent acts or conduct of a subcontractor[.]"); *Columbia Mut. Ins. Co. v. Epstein*, 239 S.W.3d 667 (Mo.Ct.App.2007) (concluding defective workmanship constituted an "occurrence" under CGL policy); *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 350 Mont. 184, 206 P.3d

919 (2009) (deciding subcontractor's faulty product constituted an "event" so as to be covered by subject CGL policy); *K & L Homes, Inc. v. American Family Mut. Ins. Co.*, 829 N.W.2d 724, 736 (N.D.2013) ("We conclude faulty workmanship may constitute an 'occurrence' if the faulty work was 'unexpected' and not intended by the insured, and the property damage was not anticipated or intentional, so that neither the cause nor the harm was anticipated, intended, or expected."); *Corner Constr. Co. v. United States Fid. & Guar. Co.*, 638 N.W.2d 887 (S.D.2002) (finding CGL policy provided coverage for subcontractors' faulty workmanship); *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 308 (Tenn.2007) (observing that "the [CGL] policy in this case provides coverage to any 'property damage' caused by an event that was not foreseeable to [the insured], including continuous exposure to substantially the same generally harmful conditions" such as those resulting from the subcontractor's defective work); *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 4 (Tex. 2007) ("We conclude that allegations of unintended construction defects may constitute an 'accident' or 'occurrence' under the CGL policy[.]"); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65 (2004) (concluding property damage resulting from subcontractor's defective work constituted an "occurrence" under CGL policy).

**20.** *See* Ark.Code Ann. § 23–79–155(a)(2) (2011) ("A commercial general liability insurance policy offered for sale in this state shall contain a definition of 'occurrence' that includes: ... Property damage or bodily injury resulting from faulty workmanship."); Colo.Rev.Stat. § 13–20–808(3) (2010) ("In interpreting a liability insurance policy issued to a construction professional, a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other work, is an accident unless the property damage is intended and expected by the insured."), *retroactive application limited by Colorado Pool Sys., Inc. v. Scottsdale Ins. Co.*, 317 P.3d 1262, No. 10CA2638, 2012 WL 5265981 (Colo.Ct.App. Oct. 25, 2012); S.C.Code Ann. § 38–61–70(B)(2) (2011) ("Commercial general liability insurance

nority of jurisdictions have adopted the position espoused by this Court therein to find that defective workmanship is not an "occurrence"; [21] however, the decisions of three of these courts have since been superseded by statutory enactments that specifically require CGL policies issued in those states to include coverage for defective workmanship and/or injuries and damages resulting therefrom.[22]

With the passage of time comes the opportunity to reflect upon the continued validity of this Court's reasoning in the face of juridical trends that call into question a former opinion's current soundness. It has been said that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 335 U.S.

policies shall contain or be deemed to contain a definition of 'occurrence' that includes: ... property damage or bodily injury resulting from faulty workmanship, exclusive of the faulty workmanship itself."), *retroactive application held unconstitutional by Harleysville Mut. Ins. Co. v. South Carolina*, 401 S.C. 15, 736 S.E.2d 651 (2012). *Cf.* Haw.Rev.Stat. § 431:1–217(a) (2011) (directing that, "[f]or purposes of a liability insurance policy that covers occurrences of damage or injury during the policy period and that insures a construction professional for liability arising from construction-related work, the meaning of the term 'occurrence' shall be construed in accordance with the law as it existed at the time that the insurance policy was issued").

21. *See Town & Country Prop., L.L.C. v. Amerisure Ins. Co.*, 111 So.3d 699, 706 (Ala.2011) ("[W]e ... conclude that faulty workmanship itself is not an occurrence[.]"); *Essex Ins. Co. v. Holder*, 372 Ark. 535, 540, 261 S.W.3d 456, 460 (2008) ("Faulty workmanship is not an accident; instead, it is a foreseeable occurrence, and performance bonds exist in the marketplace to insure the contractor against claims for the cost of repair or replacement of faulty work."), *superseded by statute*, Ark.Code Ann. § 23–79–155(a)(2) (2011) (requiring CGL insurance policies to define "occurrence" to include "[p]roperty damage or bodily injury resulting from faulty workmanship"); *General Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 535 (Colo.Ct.App.2009) ("[C]laims of poor workmanship, standing alone, are not occurrences that trigger coverage under CGL policies[.]"), *superseded by statute*, Colo.Rev.Stat. § 13–20–808(1)(b)(III) (2010) ("The general assembly declares that: ... The decision of the Colorado court of appeals in *General Security Indemnity Company of Arizona v. Mountain States Mutual Casualty Company*, 205 P.3d 529 (Colo.App. 2009) does not properly consider a construction professional's reasonable expectation that an insurer would defend the construction professional against an action or notice of claim contemplated by this part 8."); *Group Builders Inc. v. Admiral Ins. Co.*, 123 Hawai'i 142, 148, 231 P.3d 67, 73 (Ct.App.2010) ("We hold that under Hawai'i law, construction defect claims do not constitute an 'occurrence' under a CGL policy."); *State Farm Fire & Cas. Co. v. Tillerson*, 334 Ill.App.3d 404, 268 Ill.Dec. 63, 68, 777 N.E.2d 986, 991 (2002) ("Where the defect is no more than the natural and ordinary consequences of faulty workmanship, it is not caused by an accident." (citation omitted)); *W.C. Stewart Constr., Inc. v. Cincinnati Ins. Co.*, 770 N.W.2d 850 (Iowa Ct. App.2009) (finding CGL policy did not provide coverage for defective work); *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 76 (Ky.2010) ("Simply put, faulty workmanship is not an accident[.]" (internal quotations and footnote omitted)); *Auto-Owners Ins. Co. v. Home Pride Cos., Inc.*, 268 Neb. 528, 535, 684 N.W.2d 571, 577 (2004) ("[W]e conclude that faulty workmanship, standing alone, is not covered under a standard CGL policy because it is not a fortuitous event."); *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.*, 160 N.H. 690, 693, 8 A.3d 24, 28 (2010) ("[D]efective work, standing alone, does not constitute an occurrence." (citation omitted)); *Firemen's Ins. Co. of Newark v. National Union Fire Ins. Co.*, 387 N.J.Super. 434, 447–49, 904 A.2d 754, 762–63 (App.Div.2006) (concluding that faulty construction, standing alone, does not constitute an "occurrence"); *Production Sys., Inc. v. Amerisure Ins. Co.*, 167 N.C.App. 601, 607, 605 S.E.2d 663, 666 (2004) ("[D]amages based solely on shoddy workmanship ... are not 'property damage' within the meaning of a standard form CGL policy." (internal quotations and citation omitted)); Syl., *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St.3d 476, 979 N.E.2d 269 (2012) ("Claims of defective construction or workmanship brought by a property owner are not claims for 'property damage' caused by an 'occurrence under a commercial general liability policy."); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 335, 908 A.2d 888, 899 (2006) ("[T]he definition of 'accident' required to establish an 'occurrence' under the [CGL] policies cannot be satisfied by claims based upon faulty workmanship." (footnote omitted)); *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 123, 621 S.E.2d 33, 36 (2005) ("[B]ecause faulty workmanship is not something that is typically caused by an accident or by exposure to the same general harmful conditions, we hold that the damage in this case did not constitute an occurrence." (footnote omitted)), *superseded by statute*, S.C.Code Ann. § 38–61–70(B)(2) (2011) (requiring policies of CGL insurance to define "occurrence" to include "property damage or bodily injury resulting from faulty workmanship").

22. *See supra* notes 20 & 21.

595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (per curiam) (Frankfurter, J., dissenting). Insofar as the "[d]etermination of the proper coverage of an insurance contract . . . is a question of law," Syl. pt. 1, in part, *Tennant*, 211 W.Va. 703, 568 S.E.2d 10, and "[t]he interpretation of an insurance contract . . . is a legal determination that . . . shall be reviewed *de novo* on appeal," Syl. pt. 2, in part, *Riffe*, 205 W.Va. 216, 517 S.E.2d 313, we undertake a plenary review of the coverage question squarely before us: does defective workmanship constitute an "occurrence" under a policy of CGL insurance? We find that, consistent with the decisions rendered by a majority of our sister jurisdictions, it does.

 In order for a claim to be covered by the subject CGL policy, it must evidence "bodily injury" or "property damage" that has been caused by an "occurrence." An "occurrence," in turn, is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy at issue herein, though, does not provide a definition for "accident." We previously have considered the proper meaning to be accorded to the term "accident" when it is used, but not defined, in a policy of insurance. In the sole Syllabus point of *Columbia Casualty Co. v. Westfield Insurance Co.*, 217 W.Va. 250, 617 S.E.2d 797 (2005), we held as follows:

> In determining whether under a liability insurance policy an occurrence was or was not an "accident"—or was or was not deliberate, intentional, expected, desired, or foreseen—primary consideration, relevance, and weight should ordinarily be given to the perspective or standpoint of the insured whose coverage under the policy is at issue.

Pursuant to *Columbia*, then, it is apparent that the circumstances giving rise to the claimed damages or injuries must not have been "deliberate, intentional, expected, desired, or foreseen" by the insured. *Id.* The named insured under the subject CGL policy is Pinnacle.[23]

It goes without saying that the damages incurred by Ms. Cherrington during the construction and completion of her home, or the actions giving rise thereto, were not within the contemplation of Pinnacle when it hired the subcontractors alleged to have performed most of the defective work. Common sense dictates that had Pinnacle expected or foreseen the allegedly shoddy workmanship its subcontractors were destined to perform, Pinnacle would not have hired them in the first place. Nor can it be said that Pinnacle deliberately intended or even desired the deleterious consequences that were occasioned by its subcontractors' substandard craftsmanship. To find otherwise would suggest that Pinnacle deliberately sabotaged the very same construction project it worked so diligently to obtain at the risk of jeopardizing its professional name and business reputation in the process. We simply cannot find that the alleged damages incurred by Ms. Cherrington were "deliberate, intentional, expected, desired, or foreseen" by Pinnacle, the insured under the CGL policy at issue in this case. *See* Syl., *Columbia*, 217 W.Va. 250, 617 S.E.2d 797.

 Furthermore, a finding based upon our prior case law to the effect that the defective workmanship at issue in this case is not covered by the CGL policy's insuring clause is incongruous with the policy's express language providing coverage for the acts of subcontractors. As explained in more detail in Section III.A.2.a., *infra*, the CGL policy's Exclusion L specifically provides coverage for work performed by subcontractors by excepting it from the "your work" exclusion:

> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

We previously have held that "[a]n insurance policy should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties." Syl. pt. 2, *D'Annunzio v. Security–Connecticut Life Ins. Co.*, 186 W.Va. 39, 410 S.E.2d 275 (1991). Application of our prior holdings to find that

23. The policy also lists additional insureds, none of whom are parties to the instant proceedings.

the defective work of subcontractors does not constitute an "occurrence" and thus is not covered by the subject CGL policy would, indeed, create an absurd result when the policy expressly provides coverage for damages occasioned by subcontractors acting on behalf of the insured. Therefore, we conclude that the more sound approach to interpreting the subject policy is to find that defective work performed by a subcontractor on behalf of an insured does give rise to an "occurrence" under a policy of CGL insurance to maintain consistency with the policy's stated intention to provide coverage for the work of subcontractors.

Finally, we find our prior proscriptions limiting the scope of the coverage afforded by CGL policies to exclude defective workmanship to be so broad in their blanket pronouncement that a policy of CGL insurance may never provide coverage for defective workmanship as to be unworkable in their practical application. In *Pioneer*, we stated that "CGL policies of insurance do not provide protection for poor workmanship[.]" 206 W.Va. at 511, 526 S.E.2d at 33. In *Corder*, we reiterated this statement by holding that "[c]ommercial general liability policies are not designed to cover poor workmanship. Poor workmanship, standing alone, does not constitute an 'occurrence' under the standard policy definition of this term[.]" Syl. pt. 2, in part, 210 W.Va. 110, 556 S.E.2d 77. In *Brackenrich*, we again announced that "faulty workmanship claims . . . are outside the risks assumed by a traditional commercial general liability policy." Syl. pt. 3, in part, 217 W.Va. 304, 617 S.E.2d 851. Although all of these cases involved claims by a property owner against a contractor, our overly-broad, perfunctory holdings in *Pioneer*, *Corder*, and *Brackenrich* apply with equal force to preclude a contractor, such as Pinnacle, from recovering under its CGL policy for damages resulting from the defective work of its subcontractor even though Pinnacle's policy expressly provides coverage for "damaged work . . . performed . . . by a subcontractor." We do not think that a holding of this Court that must be altered every time the same issue comes before us is a solid pronouncement of the law upon which future litigants may reasonably rely to guide their future conduct. *See* Syl. pt. 2, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001) ("This Court will use signed opinions when new points of law are announced and those points will be articulated through syllabus points as required by our state constitution.").

For the foregoing reasons, we therefore hold that defective workmanship causing bodily injury or property damage is an "occurrence" under a policy of commercial general liability insurance. To the extent our prior pronouncements in Syllabus point 3 of *Webster County Solid Waste Authority v. Brackenrich and Associates, Inc.*, 217 W.Va. 304, 617 S.E.2d 851 (2005); Syllabus point 2 of *Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77 (2001); Syllabus point 2 of *Erie Insurance Property and Casualty Co. v. Pioneer Home Improvement, Inc.*, 206 W.Va. 506, 526 S.E.2d 28 (1999); and Syllabus point 2 of *McGann v. Hobbs Lumber Co.*, 150 W.Va. 364, 145 S.E.2d 476 (1965), and their progeny are inconsistent with this opinion, they are expressly overruled. Applying this holding to the facts of the case *sub judice*, we conclude that the circuit court erred by concluding that there had been no "occurrence" so as to trigger coverage under Pinnacle's CGL policy. Thus, we reverse the circuit court's ruling in this regard.

However, in addition to finding that the allegedly defective workmanship complained of herein constituted an "occurrence," we must also determine whether the remainder of the policy's insuring clause has been satisfied. Pinnacle's CGL policy provides that

[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" [24] or "property damage" [25] to which this insurance applies.

This insurance applies to "bodily injury" and "property damage" only if:

1) The "bodily injury" [26] or "property

---

24. *See supra* note 10.

25. *See* note 11, *supra*.

26. *See supra* note 10.

damage"[27] is caused by an "occurrence"[.]

(Footnotes added). Therefore, we must ascertain whether Ms. Cherrington's claimed losses as a result of said "occurrence" satisfy the definition of "bodily injury" or "property damage" so as to be covered under the subject policy.

■■■ The CGL policy at issue herein defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." In her complaint, Ms. Cherrington avers that she "has been subjected to emotional distress," but she does not allege that she has suffered a "bodily injury, sickness or disease" as a result of the defective workmanship. We previously have held that "[i]n an insurance liability policy, purely mental or emotional harm that ... lacks physical manifestation does not fall within a definition of 'bodily injury' which is limited to 'bodily injury, sickness, or disease.'" Syl. pt. 1, in part, *Smith v. Animal Urgent Care, Inc.*, 208 W.Va. 664, 542 S.E.2d 827 (2000). Because there is no indication that Ms. Cherrington's emotional distress has physically manifested itself, we conclude that she has not sustained a "bodily injury" to trigger coverage under Pinnacle's CGL policy.

■■■ "Property damage" is defined by the subject CGL policy as

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

We find that, under either of these definitions, Ms. Cherrington has demonstrated that she has sustained "property damage" as a result of the allegedly defective construction and completion of her home. As either allegedly defective work, itself, or as a direct consequence thereof, Ms. Cherrington has identified the following defects for which she seeks repair and recompense: an uneven concrete floor on the home's lower level; roof leaking that has damaged the ceiling, walls, and chimney joint; wood components that directly touch the soil; settlement that allegedly has produced a sagging support beam and numerous cracks in the home's walls and partitions; and various other items requiring repair, including systems for water diversion, roof seams, flashing, caulking, and paint. Given this extensive list of damaged items in her home resulting from the allegedly defective construction and completion work, we find that Ms. Cherrington has asserted a claim for " 'property damage' ... caused by an 'occurrence' " under Pinnacle's CGL policy. Therefore, we reverse the circuit court's ruling concluding that Ms. Cherrington had not presented a claim for "property damage" for which coverage would be provided under Pinnacle's CGL policy.

**2. Exclusions to coverage under CGL policy.** After finding that Ms. Cherrington's claims did not constitute an "occurrence" under Pinnacle's CGL policy and thus that there was no coverage under the CGL policy, the circuit court observed that, "therefore, exclusionary provisions in said polic[y] need not be examined." However, the court continued its analysis by stating, "Nevertheless the Court concludes that various exclusionary provisions would operate to preclude coverage for [Ms. Cherrington's] claims against [Pinnacle]." After setting forth the three exclusions at issue herein, *i.e.*, Exclusions L, M, and N,[28] the circuit court ruled as follows:

[Ms. Cherrington] and [the Petitioners] maintained that exclusion (*l*) was inapplicable as various work complained of was performed by subcontractors. Erie submitted, however, that exclusion (m) applied and *included* the work of subcontractors. Erie's rebuttal expert witness testified accordingly. Notably, exclusion (m) operated to bar coverage, irrespective of the existence of subcontractors, in the strikingly similar case of *Groves v. Doe*, 333 F.Supp.2d 568 (N.D.W.Va.2004). Exclusion (m) was also referenced by the Su-

---

27. *See* note 11, *supra*.

28. The text of each of these exclusions will be set forth, *infra*.

preme Court of Appeals of West Virginia in *Corder [v. William W. Smith Excavating Co.,* 210 W.Va. 110, 556 S.E.2d 77 (2001) ], *supra,* [118, 556 S.E.2d] at 85. Moreover, the Fourth Circuit Court of Appeals recently upheld a District Court's award of judgment which had been based upon, among other issues, exclusion (m). *North American Precast, Inc. v. General Cas. Co. of Wisconsin,* [413 Fed.Appx. 574,] 577, n. 1 (4th Cir. Mar. 2, 2011) (per curiam)[.]

As a matter of law, the Court concludes that, even if the claims alleged by [Ms. Cherrington] herein satisfy the CGL policy's insuring clause, they are excluded from coverage by exclusion (m).

(Emphasis in original).

▉▉▉▉ At the outset, we note that while the circuit court provided greater detail for its finding that coverage is precluded by Exclusion M, it rendered a mere summary disposition of its rulings regarding the preclusive effect of Exclusions L and N when it "conclude[d] that various exclusionary provisions would operate to preclude coverage for [Ms. Cherrington's] claims[.]" We previously have held that "[a]lthough our standard of review for summary judgment remains *de novo,* a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." Syl. pt. 3, *Fayette Cnty. Nat'l Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997). In other words, "[f]or meaningful appellate review, . . . the circuit court's order must provide clear notice to all parties and the reviewing court as to the rationale applied in granting or denying summary judgment." *Lilly,* 199 W.Va. at 353–54, 484 S.E.2d at 236–37. *Accord Thomas ex rel.*

Thomas v. State Farm Auto. Ins. Co., No. 11–0750, 2012 WL 5232255, at *2 n. 5 (W.Va. Oct. 19, 2012) (noting deficiency of circuit court's order); *Pruitt v. West Virginia Dep't of Pub. Safety,* 222 W.Va. 290, 294–95, 664 S.E.2d 175, 179–80 (2008) (same). In the case *sub judice,* the circuit court's order does not adequately explain, to the parties or to this Court, its rationale for finding that Exclusions L and N also operate to preclude coverage for Ms. Cherrington's claims. Despite this dearth of information, we nevertheless are able to consider the merits of the Petitioners' assignments of error regarding these rulings because the subject policies are contained in the appendix record and resolution of this issue ultimately requires our plenary determination of a question of law. *See, e.g.,* Syl. pt. 1, *Tennant v. Smallwood,* 211 W.Va. 703, 568 S.E.2d 10 (holding that resolution of coverage provided by policy of insurance constitutes a question of law); Syl. pt. 2, *Riffe v. Home Finders Assocs., Inc.,* 205 W.Va. 216, 517 S.E.2d 313 (same). Our consideration of these rulings notwithstanding, circuit courts are reminded of their duty to prepare orders that adequately inform the parties and this Court of the reasons underlying their rulings. *See generally Fayette Cnty. Nat'l Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232.

▉▉▉ **a. Exclusion L.** The first exclusion at issue herein is Exclusion L. The pertinent policy language describes this exclusion as follows:

This insurance does not apply to:

. . . .

**l. Damage to Your Work**

"Property damage" [29] to "your work" [30] arising out of it or any part of it and included in the "products-completed operations hazard." [31]

1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
2) The providing of or failure to provide warnings or instructions.

---

**29.** *See supra* note 11.

**30.** Pursuant to the CGL policy,
"Your work":
 a. Means:
 1) Work or operations performed by you or on your behalf; and
 2) Materials, parts or equipment furnished in connection with such work operations.
 b. Includes

**31.** We need not consider the policy's definition of this term as it does not apply to the facts of the case before us.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Emphasis in original; footnotes added). Ruling upon the applicability of this exclusion to preclude coverage for Ms. Cherrington's claims, the circuit court stated simply that "[Ms. Cherrington] and [the Petitioners] maintained that exclusion (*l*) was inapplicable as various work complained of was performed by subcontractors." Before this Court, the Petitioners complain that the circuit court erred by finding that this exclusion operates to preclude coverage in this case, while Erie contends that the circuit court made no definitive ruling on this point. As we have observed, though, the circuit court expressly indicated that it "conclude[d] that various exclusionary provisions would operate to preclude coverage for [Ms. Cherrington's] claims against [Pinnacle]" immediately before it quoted the language of Exclusion L.

This Court construes insurance policies according to express language set forth therein. "Language in an insurance policy should be given its plain, ordinary meaning." Syl. pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W.Va. 430, 345 S.E.2d 33 (1986), *overruled on other grounds by National Mutual Insurance Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987), *overruled on other grounds by Potesta v. United States Fidelity & Guaranty Co.*, 202 W.Va. 308, 504 S.E.2d 135 (1998). *Accord Polan v. Travelers Ins. Co.*, 156 W.Va. 250, 255, 192 S.E.2d 481, 484 (1972) ("[T]he terms of an insurance policy should be understood in their plain, ordinary and popular sense, not in a strained or philosophical sense."). Thus, "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl., *Keffer v. Prudential Ins. Co. of America*, 153 W.Va. 813, 172 S.E.2d 714 (1970).

We find the language in Exclusion L to be plain and conclude that, by its own terms, Exclusion L excludes coverage for the work of Pinnacle but does not operate to preclude coverage under the facts of this case for work performed by Pinnacle's subcontractors. The first paragraph of Exclusion L specifically states that the subject CGL policy does not provide coverage for the insured's own work. However, in the second paragraph of this exclusion, an exception to its application and operation applies where the work at issue has been performed by subcontractors: "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." *Accord Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 67 A.3d 961, 983 (2013) ("When read together, the 'your work' exclusion and the 'subcontractor exception' eliminate coverage for property damage caused by an insured contractor's work, but restore coverage for property damage caused by a subcontractor's work."); *Broadmoor Anderson v. National Union Fire Ins. Co. of Louisiana*, 912 So.2d 400, 408 (La.Ct.App. 2005) ("[W]hile the 'your work' exclusion would broadly exclude property damage (as opposed to 'bodily injury') arising from the insured's own defective work on a construction project, an insured/general contractor which experiences the unanticipated risk of its subcontractor's defective work remains covered for that risk under the products-completed operations coverage."); *K & L Homes, Inc. v. American Family Mut. Ins. Co.*, 829 N.W.2d 724, 732 (N.D.2013) (explaining that form CGL policy language was amended in 1986 to include Exclusion L because "[t]he insurance and policyholder communities agreed that the CGL policy should provide coverage for defective construction claims so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself" (internal quotations and citation omitted)). Here, the parties do not dispute that the majority of the construction and completion of Ms. Cherrington's home was done at the behest of Pinnacle by its subcontractors. Because Exclusion L expressly does not apply to preclude coverage for the work of subcontractors, we find that coverage is not barred by the operation of Exclusion L. Accordingly, we reverse the circuit court's ruling on this point.

**▆ b. Exclusion M.** Next the circuit court considered Exclusion M, which provides as follows:

This insurance does not apply to:

. . . .

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" [32] to "impaired property" [33] or property that has not been physically injured, arising out of:

1) A defect, deficiency, inadequacy or dangerous condition in "your product" [34] or "your work" [35]; or

2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" [36] or "your work" [37] after it has been put to its intended use.

(Emphasis in original; footnotes added). Determining that this exclusion operated to bar coverage, the circuit court primarily relied upon two federal court decisions to support its ruling. Despite its citation of supporting authority, the circuit court failed to explain how, exactly, Exclusion M applies to the facts of the case *sub judice.* Before this Court, the Petitioners contend that the circuit court's ruling finding that Exclusion M

operates to bar coverage for Ms. Cherrington's claims was erroneous. By contrast, Erie argues that the circuit court correctly found that Exclusion M applies to the facts of this case to bar coverage.

**▆** As we have observed, this Court is constrained to interpret and apply provisions in policies of insurance according to their plain language and accepted meaning. *See* Syl. pt. 1, *Soliva,* 176 W.Va. 430, 345 S.E.2d 33; *Polan,* 156 W.Va. at 255, 192 S.E.2d at 484; Syl. *Keffer,* 153 W.Va. 813, 172 S.E.2d 714. However, in doing so, we will not apply a policy's plain language to obtain illogical or incongruous results. In other words, "[a]n insurance policy should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties." Syl. pt. 2, *D'Annunzio,* 186 W.Va. 39, 410 S.E.2d 275.

The plain language of Exclusion M explicitly states that it applies to preclude coverage for two reasons: (1) a shortcoming in "your product" or "your work" and (2) an issue arising from the insured's or the insured's agent's failure to perform his/her contractual obligations. With respect to this first criterion, *i.e.,* a shortcoming in "your product" or "your work," as we noted in the foregoing section, the vast majority of the construction work performed on Ms. Cher-

**32.** *See supra* note 11.

**33.** The term "impaired property"
means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
 a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
 b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:
 a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
 b. Your fulfilling the terms of the contract or agreement.

**34.** The CGL policy at issue herein defines "your product" as follows:
"Your product":
 a. Means:
 1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
 a) You;

 b) Others trading under your name; or
 c) A person or organization whose business or assets you have acquired; and
 2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
 b. Includes
 1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product," and
 2) The providing of or failure to provide warnings or instructions.
 c. Does not include vending machines or other property rented to or located for the use of others but not sold.

**35.** *See* note 30, *supra.*

**36.** *See supra* note 34.

**37.** *See* note 30, *supra.*

rington's home was not completed by Pinnacle, itself, but by its subcontractors. By definition, "your work," as it is used in Exclusion M, contemplates either "[w]ork or operations performed by you" or "[w]ork or operations performed ... on your behalf." As such, Exclusion M, on its face, precludes coverage for the very same work of subcontractors that Exclusion L specifically found to be covered by the subject policy. To adopt the rationale of the circuit court and Erie would produce an absurd and inconsistent result because, on the one hand, Exclusion L of the policy provides coverage for the work of subcontractors, while, on the other hand Exclusion M bars coverage for the exact same work. We do not think that it is reasonable to construe two policy exclusions according to their plain language when the operative effect of this exercise results in such incongruous results. *See* Syl. pt. 2, *D'Annunzio*, 186 W.Va. 39, 410 S.E.2d 275. In short, we do not subscribe to an insurance policy construction that lends itself to the mantra: what the policy giveth in one exclusion, the policy then taketh away in the very next exclusion. *See generally Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1045 (7th Cir.1987) (construing insurance policy to find coverage where one policy provision specifically provided coverage for subject conduct while subsequent policy provision attempted to exclude coverage for very same conduct), *overruled on other grounds by National Cycle, Inc. v. Savoy Reinsurance Co. Ltd.*, 938 F.2d 61 (7th Cir.1991). Accordingly, we find that the first provision of Exclusion M does not operate to bar coverage for the work performed by Pinnacle's subcontractors.

 Moreover, we find that Exclusion M does not operate to bar coverage pursuant to its second proviso: an issue arising from the insured's or the insured's agent's failure to perform his/her contractual obligations. The parties do not contend that the construc-

tion and structural damages to Ms. Cherrington's home resulted from breach of contract or failure to perform contractual obligations,[38] nor has Erie argued that this proviso of Exclusion M applies to deny coverage in this case. We previously have held that it is the insurer's obligation to prove the applicability of an exclusion to preclude coverage. "An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. pt. 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987), *overruled on other grounds by Potesta v. United States Fid. & Guar. Co.*, 202 W.Va. 308, 504 S.E.2d 135 (1998). Because the record before us does not suggest that the physical damage to Ms. Cherrington's home was attributable to her breach of contract claim and, further, because Erie has failed to demonstrate that the second proviso of Exclusion M is applicable to the facts of this case, we conclude that this provision of Exclusion M also does not apply to bar coverage in this case. Therefore, we reverse that portion of the circuit court's order reaching a contrary conclusion.

**c. Exclusion N.** The final CGL policy exclusion at issue herein is Exclusion N. Exclusion N provides as follows:

This insurance does not apply to:

. . . .

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1) "Your product"; [39]

2) "Your work"; [40] or

---

**38.** Indeed, the breach of contract claims contained in Ms. Cherrington's amended complaint are limited to averments that Pinnacle and Mr. Mamone breached their fiduciary duty under the parties' contract by charging additional amounts for items that Ms. Cherrington believed had been included in the original contract price. Ms. Cherrington does not allege that the physical

damages to her home were caused by any breach of contract, but rather that such damages were occasioned by allegedly negligent construction.

**39.** *See supra* note 34.

**40.** *See* note 30, *supra*.

3) "Impaired property"; [41]

> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Emphasis in original; footnotes added). In the underlying order, the circuit court did not render a specific ruling on the applicability of Exclusion N to the facts of this case. Rather, the circuit court issued a blanket decision "conclud[ing] that various exclusionary provisions would operate to preclude coverage for [Ms. Cherrington's] claims against [Pinnacle]" and quoted the referenced policy provisions, including Exclusion N. On appeal to this Court, the Petitioners contend that Exclusion N does not operate to bar coverage for Ms. Cherrington's claims because it precludes coverage for recalled products and, as such, does not apply to the facts of this case. Erie does not comment upon the applicability or effect of Exclusion N.

 From the foregoing discussion, it is clear that the terms of an insurance policy should be construed consistently with "their plain, ordinary and popular sense." *Polan v. Travelers Ins. Co.*, 156 W.Va. at 255, 192 S.E.2d at 484. In doing so, we also are bound to afford the construction that avoids "an absurd result . . . [and is] consistent with the intent of the parties." Syl. pt. 2, in part, *D'Annunzio v. Security–Connecticut Life Ins. Co.*, 186 W.Va. 39, 410 S.E.2d 275. Yet, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. pt. 5, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488.

 At issue herein is Exclusion N, which is also known as the "sistership" exclusion. This exclusion originated in an attempt to limit insurers' liability for damages attributable to recalled products:

> [E]xclusions like n are commonly referred to as "sistership" exclusions. These exclusions are typically included and applied to

shield insurers from liability for the costs associated with unanticipated product recalls, and do not apply to claims involving losses resulting from the failure of the insured's product or work, when there is no evidence of a general recall of similar products or materials from the market place.

*Auto–Owners Ins. Co. v. Rhodes*, 385 S.C. 83, 108, 682 S.E.2d 857, 871 (Ct.App.2009) (citations omitted). *Accord Fireman's Fund Ins. Co. v. Amstek Metal, LLC*, No. 07 C 647, 2008 WL 4066096, at *12 (N.D.Ill. Aug. 27, 2008); *Atlantic Mut. Ins. Co. v. Hillside Bottling Co., Inc.*, 387 N.J.Super. 224, 239, 903 A.2d 513, 522–23 (App.Div.2006). In recognition of these origins, courts typically do not apply Exclusion N to preclude coverage for mere loss of use but rather reserve this exclusion for losses occasioned by a product that has been recalled or withdrawn from the market. *See, e.g., Wausau Underwriters Ins. Co. v. State Auto. Mut. Ins. Co.*, 557 F.Supp.2d 502, 519 (D.N.J.2008) (finding Exclusion N inapplicable because complaint did not suggest that "stone fascia was recalled from the market or voluntarily withdrawn from use"); *Acuity v. City Concrete L.L.C.*, No. 4:06CV0415, 2006 WL 2987717, at *7 (N.D.Ohio Oct. 17, 2006) ("Ohio courts have interpreted an identical provision [to Exclusion N] to require a recall from the market to trigger this exclusion." (citations omitted)); *Mid–Continent Cas. Co. v. JHP Dev., Inc.*, No. Civ.A.SA04CA–192–XR, 2005 WL 1123759, at *8 (W.D.Tex. Apr. 21, 2005) (observing that "exclusion n is not applicable in contractor cases" (citation omitted)); *Garamendi v. Golden Eagle Ins. Co.*, No. A106638, 2006 WL 337599, at *18 (Cal.Ct.App. Feb. 15, 2006) ("Exclusion (n) is the product recall exclusion. It is inapplicable because it does not apply to work that has already failed. The exclusion applies to preventative recalls. There was no recall of any product at issue in the underlying action." (footnote and citations omitted)); *Auto–Owners Ins. Co. v. Rhodes*, 385 S.C. at 108, 682 S.E.2d at 871 (concluding that "[t]he circumstances giving rise to the Tort action, without question, did not involve a product recall; therefore, the

41. *See* note 33, *supra.*

circuit court did not err in finding Exclusion n inapplicable to this case"). *But see West Am. Ins. Co. v. Lindepuu,* 128 F.Supp.2d 220, 228–29 (E.D.Pa.2000) (applying Exclusion N to preclude coverage for damages caused by negligent selection and installation of doors and windows). Simply stated, "[s]ince exclusionary clauses are strictly construed in favor of finding coverage, ... courts do not consider 'recall' exclusions to bar coverage for third party damage when products are not recalled or withdrawn from the market." *Indian Harbor Ins. Co. v. Transform LLC,* No. C09–1120 RSM, 2010 WL 3584412, at *8 (W.D.Wash. Sept. 8, 2010) (citation omitted). *Accord Newark Ins. Co. v. Acupac Packaging, Inc.,* 328 N.J.Super. 385, 401–02, 746 A.2d 47, 56–57 (App.Div. 2000).

In the case *sub judice,* the circuit court has not explained its reasoning for finding that Exclusion N precludes coverage in this case. Neither has Erie spoken on this point even though it is bound to prove the facts that support the operation of an exclusion. *See* Syl. pt. 7, *McMahon,* 177 W.Va. 734, 356 S.E.2d 488 ("An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion."). Consistent with our conclusions in the preceding sections, we find that Exclusion N does not apply to bar coverage under the facts of this case.

First, as we previously observed with respect to Exclusion M, applying Exclusion N to preclude coverage for Ms. Cherrington's loss of use of her property would produce an absurd and inconsistent result with the policy's coverage provisions. *See* Syl. pt. 2, *D'Annunzio,* 186 W.Va. 39, 410 S.E.2d 275. The policy at issue in this case specifically provides coverage for the work of subcontractors. A natural consequence of damages occasioned by defective work would be loss of use of that defective structure or portion thereof. To apply this exclusion to preclude coverage for the damages occasioned by the very same work that the policy expressly

covers would render such coverage illusory and would be contrary to the policy's stated intention to provide indemnity for this specific loss. *See* Syl. pt. 5, in part, *McMahon,* 177 W.Va. 734, 356 S.E.2d 488 (holding that insurance policy exclusions "will be strictly construed ... in order that the purpose of providing indemnity not be defeated"). Thus, we find that Exclusion N does not apply to preclude coverage in this case.

Moreover, the historical basis for the adoption of this exclusion and the construction afforded to it by courts considering its application further forecloses the application of Exclusion N to bar coverage. While portions of Ms. Cherrington's house have been rendered unusable or cannot be used to the same extent as they would be had they not been damaged by allegedly defective workmanship, none of the products used in the construction of the home nor the house, itself, has been recalled from the market as contemplated by the intent underlying the origins of this exclusion. *See, e.g., Indian Harbor,* 2010 WL 3584412, at *8; *Rhodes,* 385 S.C. at 108, 682 S.E.2d at 871. Therefore, we find that application of Exclusion N to the facts of the case *sub judice* simply does not comport with the exclusion's "plain, ordinary and popular sense." *Polan,* 156 W.Va. at 255, 192 S.E.2d at 484.

Finally, as noted previously, Erie has failed to supply any supporting facts upon which to base the operation of Exclusion N or to carry its burden of proving that this exclusion operates to bar coverage in this case. *See* Syl. pt. 7, *McMahon,* 177 W.Va. 734, 356 S.E.2d 488. Accordingly, we reverse that portion of the circuit court's order concluding that Exclusion N precludes coverage for Ms. Cherrington's claims.[42]

### B. Coverage under Mr. Mamone's Homeowners Policy and Umbrella Policy

Additionally, the parties dispute whether coverage is provided by Mr. Mamone's policies of homeowners insurance and umbrella insurance. Based upon our foregoing discussion, we similarly conclude that Ms. Cher-

---

42. Furthermore, as conceded by the Petitioners' counsel during oral argument, we find that the subject CGL policy does not provide coverage for

fraud, punitive damages, or the provision of furnishings for Ms. Cherrington's home.

rington has established the existence of an "occurrence" so as to trigger coverage under Mr. Mamone's homeowners and umbrella insurance policies. Despite this conclusion, we nevertheless also must determine whether coverage under either, or both, policies is foreclosed by the operation of exclusions contained in those policies. Upon our consideration of the pertinent policy language, we conclude that the "business pursuits" exclusion set forth in both Mr. Mamone's policy of homeowners insurance and his policy of umbrella insurance preclude coverage for Ms. Cherrington's alleged injuries.

**1. Homeowners insurance policy.** In the proceedings below, the circuit court found that coverage for Ms. Cherrington's claims was precluded by the "business pursuits" exclusion in Mr. Mamone's policy of homeowners insurance. Before this Court, the Petitioners contend that the circuit court erred because the "salesperson" exception to the "business pursuits" exclusion operates to provide coverage. In this regard, the Petitioners claim that, with respect to Ms. Cherrington's alleged injuries, Mr. Mamone served as a "salesperson" in his dealings with Ms. Cherrington concerning the construction and furnishing of her Greenbrier County home; thus, they argue, coverage is available under Mr. Mamone's homeowners policy because the "salesperson" exception would apply. Erie rejects the Petitioners' contentions and asserts that the "business pursuits" exclusion operates to preclude coverage under Mr. Mamone's homeowners policy and that the "salesperson" exception thereto is not applicable to the facts of this case.

▄▄▄ The pertinent language of Mr. Mamone's homeowners policy provides:

We do not cover under *Bodily Injury Liability Coverage, Property Damage Liability Coverage, Personal Injury Liability Coverage* and *Medical Payments to Others Coverage:*

. . . .

2. **Bodily injury, property damage** or **personal injury** arising out of **business** pursuits of **anyone we protect.**

We do cover:

. . . .

b. **business** pursuits of salespersons, collectors, messengers and clerical office workers employed by others. **We** do not cover installation, demonstration and servicing operations;

. . . .

d. occasional **business** activities of **anyone we protect.** These include, but are not limited to, babysitting, caddying, lawn care, newspaper delivery and other similar activities.

**We** do not cover regular **business** activities or **business** activities for which a person is required to be licensed by the state. . . .

(Emphases in original). Mr. Mamone's homeowners policy further defines "business" as "any full-time, part-time or occasional activity engaged in as a trade, profession or occupation, including farming."

▄▄▄ When considering the language of an insurance policy, we previously have held that "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl., *Keffer v. Prudential Ins. Co.*, 153 W.Va. 813, 172 S.E.2d 714. In other words, "the terms of an insurance policy should be understood in their plain, ordinary and popular sense, not in a strained or philosophical sense." *Polan v. Travelers Ins. Co.*, 156 W.Va. at 255, 192 S.E.2d at 484. *Accord* Syl. pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 176 W.Va. 430, 345 S.E.2d 33 ("Language in an insurance policy should be given its plain, ordinary meaning."). We previously have examined the language of the "business pursuits" exclusion and found such provision clearly provides as follows: "The term 'business pursuits,' when used in a clause of an insurance policy excluding from personal liability coverage injuries 'arising out of business pursuits of any insured,' contemplates a continuous or regular activity engaged in by the insured for the purpose of earning a profit or a livelihood." Syl. pt. 1, *Camden Fire Ins. Ass'n v. Johnson,* 170 W.Va. 313, 294 S.E.2d 116 (1982). *Accord* Syl. pt. 5, *Huggins v. Tri-County Bonding Co.*, 175 W.Va. 643, 337 S.E.2d 12 (1985). Applying this exclusionary

language to the facts at issue herein, we conclude that the "business pursuits" exclusion in Mr. Mamone's homeowners insurance policy precludes coverage in this case because it is undisputed that the injuries claimed by Ms. Cherrington occurred while Mr. Mamone was acting in his professional capacity as an agent of Pinnacle.

Nevertheless, the Petitioners contend that coverage is provided through operation of the "salesperson" exception. The policy language at issue in the case *sub judice* contains an exception to the "business pursuits" exclusion for "salespersons." This exception has been found to apply to provide coverage only where the insured is, in fact, employed as a "salesperson" at the time of the occurrence giving rise to the claim. *See Killian v. Tharp*, 919 S.W.2d 19, 22 (Mo.Ct.App.1996) (finding that policy language providing coverage for business pursuits of a salesperson did not apply to provide coverage where insured was *not* employed as a salesperson). We are not persuaded, however, by the Petitioners' arguments that Mr. Mamone was a salesperson in his dealings with Ms. Cherrington.

Unquestionably, Mr. Mamone's duties as an agent of Pinnacle included the sale of Pinnacle's contracting, development, and construction services. However, with the exception of an isolated reference in his deposition wherein Mr. Mamone states that "the salesman in me kicked in" with regard to his initial contacts with Ms. Cherrington, the record in this case does not indicate that Mr. Mamone's sales responsibilities were anything but incidental to the broader duties he performed for Pinnacle. In this regard, it is noteworthy that Mr. Mamone is identified on Pinnacle's website not as a salesperson, but as the corporation's "principal." Similarly, in the third-party complaint filed by Pinnacle and Mr. Mamone, Mr. Mamone is described as "the president and shareholder of . . . The Pinnacle, Group, Inc.," not as a Pinnacle salesperson. Thus, the record does not support a finding that Mr. Mamone either was employed as a salesperson or that he was acting as a salesperson in his dealings with Ms. Cherrington; rather, the record clearly establishes that any sales work performed by Mr. Mamone was merely incidental to his

primary role as the president of Pinnacle. Finally, Ms. Cherrington has not, in her suit against Mr. Mamone and Pinnacle, alleged that either party has committed sales misconduct. On the contrary, Ms. Cherrington's original and amended complaints charged Mr. Mamone and Pinnacle with negligent home construction and improper billing for the associated construction and design costs. As such, we simply cannot conclude that Mr. Mamone was a salesperson for purposes of the "salesperson" exception to the "business pursuits" exception in his policy of homeowners insurance. Accordingly, we affirm that portion of the circuit court's order finding no coverage on this basis.

**2. Umbrella insurance policy.** Similarly, the circuit court determined that Mr. Mamone's umbrella insurance policy also precluded coverage based upon the operation of the policy's "business pursuits" exclusion. The Petitioners reiterate their argument that coverage also is provided by this policy, while Erie maintains that this exclusion applies to preclude coverage.

The relevant portion of Mr. Mamone's umbrella insurance policy states:

We do not cover:

. . . .

9. **personal injury** or **property damage** arising out of **business** pursuits or **business property** of **anyone we protect.**

**We** do cover:

. . . .

c. **business** pursuits or the ownership or use of **business property** if **underlying insurance** affords coverage with respect to such **personal injury** or **property damage,** but not for broader coverage than is provided by the **underlying insurance.** This coverage does not apply to the rendering of or failing to render professional services. . . .

(Emphasis in original). Mr. Mamone's umbrella policy additionally defines "business" as "any activity engaged in as a trade, profession or occupation, other than farming." As in the foregoing section, we also find this policy language to be plain. *See* Syl., *Keffer v. Prudential Ins. Co.,* 153 W.Va. 813, 172 S.E.2d 714. *See also* Syl. pt. 5, *Huggins v.*

*Tri–County Bonding Co.,* 175 W.Va. 643, 337 S.E.2d 12; Syl. pt. 1, *Camden Fire Ins. Ass'n v. Johnson,* 170 W.Va. 313, 294 S.E.2d 116.

Unlike Mr. Mamone's homeowners policy, his umbrella policy does not contain a "salesperson" exception to the policy's "business pursuits" exclusion. It is undisputed that, under the circumstances of this case, Ms. Cherrington sued Mr. Mamone in his capacity as an agent of Pinnacle and for acts that he allegedly did or did not perform in this regard. Consequently, coverage is barred by the umbrella policy's "business pursuits" exclusion.

■ While Mr. Mamone's umbrella policy contains an exception to the "business pursuits" exclusion that conceivably could operate to provide coverage for Mr. Mamone's business activities, this exception does not apply to the facts of this case because the exception specifically states that it provides coverage for "**business** pursuits . . . if **underlying insurance** affords coverage with respect to such **personal injury** or **property damage**[.]" (Emphasis in original). This exception further indicates that it will not provide "for broader coverage than is provided by the **underlying insurance**[.]" (Emphasis in original). The policy of insurance underlying Mr. Mamone's umbrella policy is Mr. Mamone's homeowners policy. As we explained in the preceding section, Mr. Mamone's homeowners policy does not provide coverage for Ms. Cherrington's claims by virtue of the operation of the policy's "business pursuits" exclusion and the inapplicability of the policy's "salesperson" exception thereto. Because the underlying insurance does not provide coverage for Ms. Cherrington's alleged injuries, by its own terms the umbrella policy cannot provide coverage because such coverage would be "broader coverage than is provided by the **underlying** [homeowners] **insurance.**" (Emphasis in original). Therefore, we affirm the circuit court's order to the extent it also found that Mr. Mamone's umbrella policy did not provide coverage under the facts of this case.[43]

## IV.

## CONCLUSION

For the foregoing reasons, the December 6, 2011, order of the Circuit Court of Greenbrier County is hereby affirmed as to its findings that Mr. Mamone's policies of homeowners insurance and umbrella insurance do not provide coverage under the facts of this case. However, that portion of the circuit court's order ruling that Pinnacle's policy of CGL insurance also does not provide coverage under these facts is hereby reversed, and this case is remanded for further proceedings consistent with this opinion.

Affirmed, in part; Reversed, in part; and Remanded.

43. As a final assignment of error, the Petitioners argue that the circuit court erred by not construing the subject policies of insurance consistently with their reasonable expectations that such policies would provide coverage under the facts of this case. *See* Syl. pt. 8, *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 742, 356 S.E.2d 488, 496 (1987) ("With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."), *overruled on other grounds by Potesta v. United States Fid. & Guar. Co.,* 202 W.Va. 308, 504 S.E.2d 135 (1998). Based upon our foregoing discussion, we decline to consider this issue for two reasons. First, we have found that the language of Pinnacle's CGL policy does not preclude coverage for Ms. Cherrington's claims, therefore rendering it unnecessary for us to consider an alternative ground for finding coverage under the CGL policy. Second, we have concluded that the language of Mr. Mamone's homeowners and umbrella insurance policies is plain and unambiguous. Ordinarily, the doctrine of reasonable expectations applies only to ambiguous policy provisions. *See McMahon & Sons, Inc.,* 177 W.Va. at 742, 356 S.E.2d at 496 ("[T]he doctrine of reasonable expectations is limited to those instances . . . in which the policy language is ambiguous." (citations omitted)). Although this Court has applied the doctrine of reasonable expectations in select cases not involving ambiguous policy provisions, those narrow circumstances are not present in the case *sub judice*. *See generally Luikart v. Valley Brook Concrete & Supply, Inc.,* 216 W.Va. 748, 613 S.E.2d 896 (2005) (per curiam) (discussing cases applying doctrine of reasonable expectations).